**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

CHICAGO AREA I.B. OF T. PENSION )
PLAN & TRUST and LOCAL 703 )
I.B. OF T., GROCERY AND FOOD )
EMPLOYEES' PENSION PLAN )
& TRUST, )
                               )
                *Plaintiffs,*     )     Case No.: 20-cv-7952
                               )
v.                                     )
                               )
ALLIANZ GLOBAL INVESTORS )
U.S. LLC, ALLIANZ GLOBAL )
INVESTORS U.S. HOLDINGS, LLC, )
ALLIANZ ASSET MANAGEMENT OF )
AMERICA L.P., ALLIANZ ASSET )
MANAGEMENT OF AMERICA LLC, )
PFP HOLDINGS, INC.,  ALLIANZ )
ASSET MANAGEMENT OF )
AMERICA HOLDINGS INC., )
ALLIANZ OF AMERICA INC., )
ALLIANZ ASSET MANAGEMENT )
GMBH, AND ALLIANZ SE, )
                               )
              *Defendants.*    )

## COMPLAINT

Plaintiffs Chicago Area I.B. of T. Pension Plan & Trust ("Teamster Plan") and Local

703 I.B. of T., Grocery and Food Employees' Pension Plan & Trust ("703 Plan") (together

"Pension Funds") for their Complaint against Defendants Allianz Global Investors U.S.

LLC ("AllianzGI"), Allianz Global Investors U.S. Holdings, LLC, Allianz Asset

Management of America L.P., Allianz Asset Management of America, LLC, PFP

Holdings, Inc., Allianz Asset Management of America Holdings Inc., Allianz of America

Inc., Allianz Asset Management GmbH, and Allianz SE (together, "Defendants"), states as follows:

## NATURE OF THE ACTION

1.     This is an action by the Teamster Plan, the labor union's pension benefit plan, the 703 Plan, the Local Grocer and Food Employee Union Pension Plan, and on behalf of the affected Pension Funds' participants, against Defendants for negligence, breaches of fiduciary duty and contract, and violations of the Employee Retirement Income Security Act of 1974, as amended ("ERISA") arising from AllianzGI's gross mismanagement of the Pension Funds' investments in the AllianzGI Structured Alpha 250 Fund ("Alpha 250 Fund"), the AllianzGI Structured Alpha 500 Fund ("Alpha 500 Fund") and AllianzGI Structured Alpha 1000 Fund ("Alpha 1000 Fund") (together "Alpha Funds").

2.     In violation of its contractual and fiduciary duties as well as those imposed by ERISA, AllianzGI abandoned its stated investment mandates (e.g, "**Buy put options – in a greater quantity than sold – to protect the portfolio in the event of a market crash/closure**") when positions to protect against increasing market volatility were needed most. Rather than protect against a market crash, AllianzGI positioned the Alpha Funds' portfolios in a manner contrary to its investment mandate; all but guaranteeing substantial losses once that downturn came to pass.  Defendants'  negligent and wrongful actions resulted in massive losses for the Pension Funds, wiping out in a matter of weeks

tens of millions of dollars of Pension Funds' assets that Pension Fund participants had earned over their entire working careers.

3.     AllianzGI has since admitted that its positioning of the Funds' portfolios, contrary to the Funds' stated mandate, in late February and early March 2020 was done to "recoup" losses the Alpha Funds incurred in early February. However, AllianzGI's decisions left the Alpha Funds dangerously exposed to even the slightest increase in market volatility or further decline in equity prices—the very conditions Allianz economists, and many others, warned were on the immediate horizon.

4.     AllianzGI did not simply make a bad judgment in the midst of a market disruption: it jettisoned the Alpha Funds' investment objective—repeatedly touted by AllianzGI and memorialized in contracts with the Pension Funds—that the risk management and investment strategies employed by AllianzGI were designed to protect the Alpha Funds' investors against the very market conditions experienced from February through May of 2020.

5.     In 2016, the Pension Funds were looking to diversify their portfolios by adding investment managers that would provide downside protection to the Pension Funds in the event of a declining equity market. AllianzGI presented its investment philosophy to the Pension Funds as an "absolute-return strategy that pursues risk-controlled returns" and that would "**perform whether equity markets are up or down, smooth or volatile**." According to AllianzGI, the Alpha Funds would "[p]rotect against a market crash" by utilizing several risk-monitoring tactics, including rigorous "what-if"

scenario testing, supposedly, a "cornerstone of the strategy's investment processes" which included "multiple layers of risk control" and "structural risk protections" to "protect the portfolio in the event of a market crash."

6.      The Alpha Funds were supposed to generate returns in times of rising or falling equity markets and during both low and high market volatility.  As AllianzGI stated in the Alpha Funds' marketing materials, which are incorporated into the agreements between the Pension Funds and AllianzGI, "The Allianz Structured Alpha strategy aims to provide consistent, uncorrelated returns **regardless of the direction of equities and volatility**. The strategy pursues risk-controlled returns by buying and selling put and call options on US equity and volatility indexes."

7.      The Alpha Funds purportedly were safe even "**in the event of a market crash**," including in the case of "a severe downside market move, such as the Black Monday of 1987."  A "key feature of the strategy's risk management" was downside risk protections "designed for tail risk protection, not for outperformance potential." In establishing these positions, Allianz was supposed to buy put options in a greater quantity than it sold to "protect the portfolio in the event of a market crash/closure" and which were to be "laddered for various market outcomes to the downside," ensuring protection in a wide range of negative scenarios.

8.      The Alpha Funds' investment mandate required active portfolio management and close monitoring by Defendants, not just the manager AllianzGI, to ensure protection against a market crash and to be both short and long volatility as

4

market conditions changed—a portfolio construction that required stringent risk management policies and protocols to ensure that the strategy worked as represented by the contracts and related materials. AllianzGI purportedly performed "tail-risk protection, risk reduction, and/or volatility smoothing" based on "analysis of historical movements of broad-based US indices, as well as rigorous scenario testing," and was required to stress test the portfolio under the very kinds of market conditions that occurred in February and March 2020.

9.      In order to diversify the Pension Fund portfolio and provide downside protection in down markets, in late September 2016, the 703 Pension Plan invested $7.5 million in the Alpha 250 Fund and then in December 2016 invested an additional $2 million in each of the Alpha 500 and Alpha 1000 Funds.  Around the same time, in late October 2016, the Teamster Plan invested $7.5 million in the Alpha 500 Fund and an additional $7.5 million in the Alpha 1000 Fund.

10.      From 2016 until February 2020, the Alpha Funds appeared, from the outside, to generate returns in excess of the benchmark indexes.  For that reason, in 2018, the 703 Plan made an additional investment in the Alpha 250 Fund of $5.2 million and the Teamster Plan contributed an additional $3,000,000 investment in both the Alpha 500 Fund and Alpha 1000 Fund.

11.      However, in late February 2020, global markets began to experience volatility as COVID-19 spread beyond China. At the same time, as investor concerns over the impact of the coronavirus began reverberating through the markets, AllianzGI

positioned the Alpha Funds as "short" volatility—meaning that the Alpha Funds would suffer losses if market volatility continued to increase, exposing the Alpha Funds to catastrophic losses in the event of a market downturn.

12.     The increase in the premiums associated with selling protection against volatility allowed AllianzGI to sell options to other investors at increased premiums, perhaps in an attempt to "recoup" losses suffered by the Alpha Funds in early February 2020. However, this new strategy conflicted with the Alpha Funds' stated mandate, and AllianzGI's duty to the Pension Funds, of maintaining market neutrality. Specifically, with volatility at record highs, AllianzGI made a risky attempt to profit by selling far more volatility protection than it purchased. These positions would only generate positive results if volatility decreased. This strategy absent proportional protective strategies—undertaken with the Pension Funds' assets—appears to have been premised on the assumption that volitility would decrease and any market decline would turn out to be minor.

13.     As March 2020 began and the pandemic raged, market volatility surged. And as Allianz economists predicted, investor uncertainty concerning the economic impact of the coronavirus triggered substantial, but not unprecedented, market volatility and prompted sharp declines in equity prices. The Alpha Funds suffered catastrophic losses because AllianzGI sold the volatility protection to other investors without sufficiently offsetting downside protection. While Defendants were obligated to have positions in place to protect against losses in the event of a market downturn, in reality,

6

the hedges AllianzGI executed were not hedges at all,  but instead materially increased the risk to the Pension Funds.  Worst of all, the improper market bets made by AllianzGI locked in the losses, exacerbating a problem that was already spiraling out of control.

14.     Despite  AllianzGI's  supposedly  robust  risk  management  practices, Defendants simply did not carry out the mandated, downside protection strategy and the mandate Allianz marketed to its clients completely failed – with a catastrophic impact on the  Pension  Funds'  assets  in  the  Alpha  Funds  due  to  Defendants'  gross  negligence, mismanagement and failure to monitor AllianzGI.

15.     The Teamster Plan assets maintained in the Alpha 1000 fund were virtually wiped out in a matter of weeks while the Teamster Plan's investment in the Alpha 500 Fund was halved.  In total, the Teamster Plan lost more than $18.5 million:

|  | 1/31/20 | 2/29/20 | 3/31/20 |
|---|---|---|---|
| Alpha 500 | $11,973,638 | $10,728,177 | $5,886,346 |
| Alpha 1000 | $13,057,743 | $10,171,951 | $356,236 |

16.     In total, the 703 Plan assets invested in the Alpha Funds lost nearly $13 million in a two month span:

|  | 1/31/20 | 2/29/20 | 3/31/20 |
|---|---|---|---|
| Alpha 250 | $18,716,450 | $16,280,428 | $9,498,361 |
| Alpha 500 | $2,305,259 | $2,065,473 | $1,133,286 |

7

| Alpha 1000 | $2,521,327 | $1,964,108 | $68,786 |

17.     On a conference call with the Pension Funds' representatives following the crash, Allianz admitted that "we should have been able to handle" the market volatility situation and that Allianz failed to "seal" its downside position such that there was no floor with respect to how much the Alpha Funds could lose.

18.     On March 25, 2020, AllianzGI announced that it was liquidating the Alpha 1000 Fund (as well as another AllianzGI product, Structured Alpha 1000 Plus) because the losses in those Funds were insurmountable.  Shortly thereafter, the Pension Funds had no choice but to seek redemption for the total remainder of its investments in the Alpha Funds, locking in substantial losses.

19.     The Pension Funds' Alpha 1000 Fund assets were reduced by 97 percent, and the Alpha 500 Fund assets by approximately 50% because of Defendants' wrongful conduct. Similarly, the 703 Plan's Alpha 250 Fund assets declined 51% between January and March 2020.

20.     As a result of Allianz's negligence, breaches of fiduciary duty and contract, and violations of ERISA, Allianz caused the Teamsters Plan to suffer losses  in excess of $18.7 million and caused the 703 Plan to suffer losses in excess of $12.9 million

21.     Since the Alpha Funds' collapse, Defendants have falsely claimed in public statements that the losses were supposedly caused by the extent and speed of the March market decline. This explanation is nonsense and contrary to the stated investment

mandates represented to the Pension Funds at the time of investment. Not surprisingly, the SEC has opened an investigation into Defendants' actions in connection with the Alpha Funds' collapse.

## PARTIES

22.     Plaintiff Chicago Area I.B. T. Pension Plan & Trust is a multi-employer defined benefit fund based in Illinois.

23.     Plaintiff Local 703, I.B. T., Grocery and Food Employees' Pension Plan & Trust is a multi-employer defined benefit fund based in Illinois.

24.     Defendant Allianz Global Investors U.S. LLC ("AllianzGI") is a registered investment advisor and a Delaware limited liability company with principal offices in New York, NY; Boston, MA; Dallas, TX; San Diego, CA; and San Francisco, CA. AllianzGI is a direct, wholly-owned subsidiary of Allianz Global Investors U.S. Holdings LLC. AllianzGI is the investment manager for the Alpha Funds.

25.     Defendant Allianz Global Investors U.S. Holdings LLC ("AllianzGI Holdings") is a Delaware limited liability company with its principal place of business at 1633 Broadway, New York, New York. AllianzGI Holdings is the direct, 100% owner and sole member of AllianzGI.

26.     Defendant Allianz Asset Management of America L.P. ("AAMA LP") is a registered investment advisory firm and a Delaware limited partnership based in Newport Beach, CA. AAMA LP is the direct, 100% owner and sole member of AllianzGI Holdings.

27.     Defendant PFP Holdings Inc. ("PFP"), a limited partner of AAMA LP, is incorporated in Delaware and has its principal place of business in Newport Beach, California.

28.     Defendant Allianz Asset Management of America Holdings Inc. ("AAMA Holdings") is a Delaware corporation with its principal place of business in Newport Beach, California. AAMA Holdings holds a 0.1% managing interest in AAMA LLC.

29.     Defendants AllianzGI, AllianzGI Holdings, AAMA LP, AAMA LLC, PFP, AAMA LLC, and AAMA Holdings are part of what Defendants branded the "Allianz Global Investors"— Allianz Group's global asset management business.

30.     Defendant Allianz of America Inc. ("Allianz of America") is a Delaware corporation with its principal place of business in Novato, California that holds a 99.8% non-managing interest in AAMA LLC. Allianz of America is a wholly-owned indirect subsidiary of Allianz SE.

31.     Defendant Allianz Asset Management GmbH ("AAM GmbH") is incorporated and headquartered in Munich, Germany and is the asset management division of Allianz SE. AAM GmbH is the direct, 100% owner of AAMA Holdings and holds a 0.1% non-managing interest in AAMA LLC. In 2019, Allianz SE reported €7.164 billion in operating revenue from the Allianz Asset Management business organized under AAM GmbH, substantially including revenues derived from AAM GmbH's activities and interests in managing the Structured Alpha Funds through the operation of Allianz Global Investors, which AAM GmbH controlled at all relevant times. Given

AAM GmbH's control and management of Allianz Global Investors, AAM GmbH was responsible for the sale, marketing, operation and risk management of the Structured Alpha Funds sold to the Pension Funds.

32.     Defendant Allianz SE is a publicly traded European insurance and financial services company based in Munich, Germany that provides asset management services to 82 million clients in over 70 countries. Allianz SE refers to itself and its subsidiaries as the "Allianz Group." Allianz SE holds a direct, nearly 75% interest in AMA GmbH and an indirect, 100% interest in Allianz of America. According to the Allianz SE Statutes, or articles of incorporation, Allianz SE's "corporate purpose" is "the direction of an internal group of companies, which is active in the areas of insurance, banking, asset management, and other financial, consulting, and similar services." Allianz SE, through its control over Allianz Global Investors, engaged in substantial management and business activities associated with the sale, distribution, supervision and risk management of the Alpha Funds, as marketed and sold to the Pension Funds.

33.     AllianzGI promoted Defendants' relationship with its parent entities in marketing the Alpha Funds to the Pension Funds.  According to AllianzGI's June 2016 presentation to the Pension Funds, Defendants' "Allianz Global Investors" had "$480bn in worldwide assets under management."  Further, AllianzGI claimed Defendants' "Organizational structure" was backing the Alpha Funds, and that the Pension Fund should take note of Allianz SE's "125-year history of successfully . . . Protecting Client

assets [and] Managing investments in a risk-aware framework" as proof of AllianzGI's

ability to execute its investment mandate on the Pension Funds' behalf:



34.     AllianzGI claimed in the presentations to the Pension Funds that "Independent risk-oversight professionals" were monitoring AllianzGI's trade activity and risk profiles daily.  Specifically, the Allianz SE Global Head of Peformance & Portfolio Risk, from an "independent subsidiary of Allianz SE," was identified as part of the "Structured Alpha investment team" responsible for Risk Management of the Alpha Funds.

35.     The personnel and operational overlap of the above Defendants establishes the principal-agency relationship between each entity and AllianzGI, which is also evidenced by their shared ownership, shared directors and officers, and a unilateral reporting structure. For example, AllianzGI's sole and direct corporate parent, AllianzGI Holdings, shares numerous overlapping directors and executives, as well as the same

business address and phone number with AllianzGI. Specifically, Gemesh Pushpaharan is both the COO and Managing Director of AllianzGI, and a member of the Executive Committee of AllianzGI Holdings. Paul Koo is both the Chief Compliance Officer of AllianzGI and a director of AllianzGI Holdings. As such, he executed AllianzGI's Forms 13G filed with the SEC on behalf of both AllianzGI and AllianzGI Holdings.

36.    Further, numerous individuals held director or managing director positions at both AllianzGI and AllianzGI Holdings: Barbara Claussen, John Carroll; David Jobson; Erin Bengtson Olivieri, Christopher Cieri, Joseph Quirk, Steven Ricci, Frank Garofalo, Bruce Goodman, David Hood, Douglas Forsyth, Peter Bonanno, and Joseph Scull.

37.    Further establishing the chain of control among these entities, AllianzGI, AllianzGI Holdings, AAMA LP, AAMA LLC, AAMA Holdings, and PFP, under current and prior entity names, have had shared directors and officers, including:

> • John Maney: COO and Managing Director of AAMA LP and AAMA LLC, and Managing Director of AllianzGI.
>
> • James Funaro: Senior Vice President of AllianzGI, AAMA LP, AAMA LLC, AAMA Holdings, and AllianzGI Holdings, and SVP of Tax Matters for PFP.
>
> • Tony Burg: Senior Vice President and Treasurer of AllianzGI, AAMA LLC, AAMA LP, AAMA Holdings, and AllianzGI Holdings.
>
> • Kellie Davidson: Secretary of AllianzGI, AAMA LLC and AAMA LP; Assistant Secretary of AAMA Holdings, AllianzGI Holdings.
>
> • Tucker Fitzpatrick: Senior Vice President and Secretary of AAMA Holdings; Senior Vice President and General Counsel of AAMA LP, Assistant Secretary of AllianzGI Holdings and Allianz GI.

• Michael Puntoriero: CFO of AAMA Holdings, AllianzGI Holdings; Managing Director and CFO of AllianzGI, AAMA LLC, AAMA LP and PFP.

• Vinh Nguyen: Senior Vice President and Treasurer of AllianzGI, AAMA LLC, AAMA LP, AAMA Holdings, and PFP.

• Colleen Martin: SVP and Controller of AllianzGI, AAMA LLC, AAMA LP, AAMA Holdings, and PFP.

• John Viggiano: Managing Director and US General Counsel with Allianz Global Investors, and who previously served as Chief Risk Officer, Head of Compliance and Regulatory Counsel for AAM GmbH.

38.    The positions held by these individuals in various subsidiaries within

Allianz Group, including AllianzGI, are summarized in the chart below:

|  | AllianzGI | AllianzGI Holdings | AAMA LP | AAMA LLC | AAMA Holdings | PFP Holdings | AAM GmbH |
|---|---|---|---|---|---|---|---|
| John Maney | X |  | X | X |  |  |  |
| James Funaro | X | X | X | X | X | X |  |
| Tony Burg | X | X | X | X | X |  |  |
| Kellie Davidson | X | X | X | X | X |  |  |
| Tucker Fitzpatrick | X | X | X |  | X |  |  |
| Michael Puntoriero | X | X | X | X | X | X |  |
| Vinh Nguyen | X |  | X | X | X | X |  |
| Colleen Martin | X |  | X | X | X | X |  |
| John Viggiano | X |  |  |  |  |  | X |

## JURISDICTION AND VENUE

39.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 because the action involves questions of federal law, specifically, the application of ERISA. ERISA § 502, 29 U.S.C. § 1132.

40.     This Court also has jurisdiction over the cause of action asserted in this Complaint pursuant to 28 U.S.C. § 1332(a)(3) (diversity of citizenship) because the dispute is between a citizen of Illinois and citizens of different U.S. states and of Germany, and the amount in controversy exceeds $75,000 exclusive of interest and costs.

41.     This Court has supplemental jurisdiction over the related state law claims pursuant to 28 U.S.C. § 1367(a) because those claims form part of the same case or controversy. The Pension Funds' state law claims share a common nucleus of operative facts with its federal law claims, and the parties are identical. Resolving the Pension Funds' federal and state claims in a single action serves the interest of judicial economy, convenience, consistency, and fairness to the parties.

42.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391 and because the parties consented to adjudicate claims in this District. (Section 8.07 of the Limited Liability Company Agreement ("LLC Agreement") and Section 2 of the operative Side Letter).

## FACTUAL BACKGROUND

**I.      The Pension Funds' Introductions to the Alpha Funds.**

43.     **The 703 Plan Invests in Alpha Funds:**  In the fall of 2016, the 703 Plan was seeking to diversify its portfolio to include investments that contained downside protection in the event of market declines.

44.     Allianz executives Jeff Sheran and Jon Berusch made a presentation to the Board of Trustees of the 703 Plan on May 4, 2016.  In that presentation, Allianz stated that the Alpha Funds provided "Consistent, uncorrelated outperformance via the equity index options market" and a "Long-term record of outperformance through various market conditions."

45.     Structured Alpha's stated three-pronged approach was: (1) "To profit during normal market conditions"; (2) "**To protect against a market crash**" ; and (3) "To navigate as wide a range of equity-market outcomes as possible." *Id.* (emphasis added)

46.     According to Allianz, the Alpha Funds included options for typical spreads as well as "directional spreads to cover greater swings in markets and then a hedging position to protect in a market crash." Allianz's strategy was to pursue absolute returns, "but does not presume the market will behave normally or that history will repeat itself. Instead, the Alpha Funds claimed it could deliver positive excess returns **irrespective of market conditions**." It held itself out as having the "**[a]bility to perform whether equity markets are up or down, smooth or volatile**."

47.     Further, the Allianz presentations also noted that the Hedging positions the Alpha Funds would have in place were "not for outperformance potential," but a key feature of the downside protection in the event of "market crash/closure":



**Hedging positions**

- Buy put options – in a greater quantity than sold – to protect the portfolio in the event of a market crash/closure
  - Crash defined as a short-term equity-market decline of 15% or more
- The puts are laddered for various market outcomes to the downside
- These positions are designed for tail risk protection, not for outperformance potential, but are a key feature of the Strategy's risk management

48.    In early October 2016, based on AllianzGI's descriptions of the Alpha Fund products, the 703 Plan decided to invest $7.5 million in AllianzGI's Alpha 250 Fund and then in December 2016, the 703 Plan invested $2 million in each of the Alpha 1000 and 500 Fund.

49.    **The Teamster Plan Invests in Alpha Funds**:  Similarly, in the fall of 2016, the Teamster Plan decided to liquidate its investments in various other investment managers.  The primary purpose in interviewing alternative investment managers was to diversify its portfolio so that the Teamster Plan would have downside protection during a declining equity market.  In this regard, AllianzGI marketed the Alpha Funds as "not dependent on whether or not the market moves up or down, simply that the market moves (i.e. exhibits volatility)."

50.    On June 7, 2016, the Teamster Plan's Board of Trustees held a meeting at which AllianzGI's Jeff Sheran, now-Managing Director of Structured Products, and Jon Berusch, Senior Relationship Manager, presented the Allianz investment strategy to the Board. AllianzGI marketed its "Structured Alpha" investment strategy to the Pension

17

Funds as optimizing the balance between returns from "selling options (short volatility)" with the "risk-control attributes associated with buying options (long volatility)."

51.     The AllianzGI executives made a nearly identical presentation to the Teamster Plan's representatives as the one made to the 703 Plan, with the identical descriptions about the hedging positions and profit potential of the Alpha Funds.

52.     In late October/early November 2016, the Teamsters Plan decided to invest $7.5 million in AllianzGI's Alpha 500 Fund and $7.5 million in AllianzGI's Alpha 1000 Fund. Thereafter, in 2018, the Teamsters Plan made an additional $3,000,000 investment in both the Alpha 500 Fund and Alpha 1000 Fund.

## II.     AllianzGI was Obligated to Manage the Pension Funds' Alpha Funds Investments to Protect in the Event of Market Decline.

53.     The rights and obligations governing the Pension Funds' investments with AllianzGI are stated in several contracts, including, for each fund: an LLC Agreement, a confidential Private Placement Memorandum ("PPM'), a Subscription Agreement, and a Side Letter.

54.     Pursuant to these agreements, AllianzGI, as investment manager for the Alpha Funds, was a fiduciary to the Pension Funds in managing their investments in the Alpha Funds.   AllianzGI is the Managing Member of the Alpha Funds and was responsible for the general and active management of the Alpha Funds.

55.     Section 2.02 states that the Managing Member must undertake "all acts for the preservation, protection, improvement, and enhancement in value of all assets. . . ." (LLC Agreement, § 2.02(r).)

18

56.     In addition, AllianzGI specifically acknowledged its role as fiduciary of the Pension Funds' assets: "in its capacity as investment manager of the Company, acknowledges that it will be a fiduciary with respect to such assets." (LLC Agreement, § 2.10.)

57.     AllianzGI purported to operate the Structured Alpha Funds with a specific investment objective: to outperform each Alpha Fund's respective benchmark index by a certain number of basis points, or one hundredth of one percent. Specifically, the Alpha 500 Fund's investment objective was to outperform the 90-Day T-Bill by approximately 7.5%, gross of fees and expenses. Reducing the net return to investors by the Alpha 500 Fund's incentive allocation and expenses, AllianzGI expected to outperform the IMI by approximately 5%.  The Alpha 1000 Fund's investment objective was to outperform the 90 Day T-Bills' benchmark index by 10%, net of fees and expenses.  The Structured Alpha US Equity 250, in which the 703 Plan invested, benchmark index was to the S&P 500 index plus 2.5% net of fees and expenses.

58.     AllianzGI's head portfolio manager, Greg Tournant, described AllianzGI's options strategy as akin to selling insurance, where a premium is paid for the rights provided by the option and a premium is collected to provide that right. While the strategy would earn a net premium from selling both put and call options, the portfolio was stated to always hold more long put option contracts relative to the number of put options sold. By doing so, AllianzGI purportedly protected against downside exposure

in a tail risk event or significant market decline, as AllianzGI would be able to exercise or sell those positions in a declining price environment.

59.     Option values are directly affected by the expected volatility of the underlying asset.  The values of both put and call options increase as the expected volatility of the underlying asset increases.  Thus, the price of the "insurance" that AllianzGI was selling to the markets through its options trading would increase as expected market volatility increased.  When expected market volatility went up, the Alpha Funds would make money on its long positions in S&P 500 options and lose money on its short positions.  Thus, when volatility was high, AllianzGI could potentially make more money by selling options, while the cost of the options it purchased to hedge its exposure would be higher.

60.     In addition to implementing various derivative trades in order to achieve the excess returns over S&P indexes, AllianzGI purportedly maintained a constant hedge against large equity sell-offs by holding long, out-of-the money puts which – AllianzGI claimed – would protect against any sudden market declines.  These trades were critical to the Alpha Funds' risk management strategy and were specifically designed to protect against downward market moves, not to generate excess returns over benchmarks. The point of these trades was to be effectively market-neutral or agnostic to implied levels of volatility.

61.     AllianzGI purported to monitor and minimize risk in a variety of ways, including, according to its literature, the following:

20

- **Structural long-put protection.** "The number of put options purchased will always exceed the number of put options sold, thereby providing the portfolio with structural protection in the event of a sharp market decline. The worse the scenario, typically the greater the profit on that day for the portfolio."

- **Real-time monitoring.** "Our risk-monitoring and scenario-analysis system allows us to model in real time any potential changes in the underlying indices and/or volatility levels, and immediately quantify the impact on the portfolio. This system allows us to optimize the restructuring of any existing profit zone in just a few minutes." *Id.*

- **Rigorous scenario testing.** "A substantial portion of the portfolio manager's time is spent analyzing highly unlikely 'what-if' scenarios and developing mathematically pre-established portfolio actions in the event of a major statistical disruption." *Id.*

62.     To add to the security of the strategy, AllianzGI claimed that "[e]ach layer of risk management" in Structured Alpha "maintains independent governance." AllianzGI "monitors trade activity and weekly risk profiles" and "an extensive set of scenario analysis" to determine whether the strategy requires "any significant shifts." *Id.*

63.     Allianz SE claimed that it separately supports the Alpha Funds by independently "aggregating risk and performing risk analysis on each portfolio," adding yet another layer of reliability. *Id.*

64.     One of the other selling points AllianzGI described to the Pension Funds was the Alpha Funds' performance fee was a "success fee" for 30% of the quarterly outperformance of the index return relative to the benchmark. If the investment matched its designated index but the product did not outperform the benchmark, the Pension Funds would owe AllianzGI no fee at all. (J. Berusch, June 7, 2016 Board Meeting Minutes.)

65.     In fact, Tournant spoke at length in a May 2016 interview, featured on AllianzGI's website, about the risk-mitigating features purportedly inherent in AllianzGI's investment strategies for the Structured Alpha Funds. When asked about the risk-management strategy for the Structured Alpha Funds, Tournant said, "The way we construct the strategy is we have a wide range of positions. Some positions are designed to make money if the market goes up, some will make money if the market goes down and some will make money [if the market] is in range bound. They exist in the portfolio all the time so therefore our objective is never to guess the direction of the market, not be dependent on the direction of the market, and hopefully we have a statistical outcome that will allow us to generate profits regardless of market directions."

66.     Analogizing the Alpha Funds' strategies to the functioning of an insurance company that would pay when there is a "catastrophic event," Tournant continued, "I would also add the fact that given the positions that we buy to protect ourselves against those catastrophic shocks, those kinds of risk insurance positions, that you could label those as reinsurance."  That is, even if a large market downturn were to occur, Tournant

explained that the Alpha Funds had "risk insurance positions" that would "further protect [the] portfolio and business."

67.    Tournant reiterated the portfolio's "market neutral" strategy in an October 2015 video presentation, telling investors that the Alpha Funds were able to generate "consistent returns over the past ten years" and performed well "regardless of market conditions," as the positions were designed to generate returns whether the market was "up, flat or down." For example, Tournant explained that prudent, active management of the portfolio enabled the Alpha Funds to "weather the recent storm" following a substantial "increase in market volatility" in October 2015 by being "able to manage actively our profit zone."

68.    Defendants purported to regularly evaluate the Alpha Funds' portfolio and counterparty risk, business risk, operational risk, and reputational risk. The Alpha Funds claimed to deploy an independent Allianz SE enterprise risk management function, which was apparently responsible for overseeing independent portfolio risk, monitoring daily trade activity, and analyzing weekly risk profiles. AllianzGI also engaged an external, independent Allianz SE risk management service provider to provide analysis and reporting services, with additional "VaR related risk analytics."

69.    The involvement of the related Allianz entities and global Allianz Global Investors enterprise and their experienced and coordinated risk management apparatus was crucial to the Alpha Funds' investment proposition. For example, in assessing a fund run by the Structured Alpha team responsible for the Alpha Funds, Morningstar analysts

cited the benefits from the "broader resources at Allianz Global Investors," including the "firm's independent risk management function [which] oversees the structured alpha platform, monitoring daily trading activity." According to Morningstar, the "team's disciplined focus on risk management—through limits on leverage, perennial crash protection through put option hedges, position diversity across expirations, and the managers' ability to adjust the risk profile during volatile markets—gives us confidence this strategy can continue to overcome such short-term setbacks" such as those that can accompany unexpected volatility spikes. Critical to that risk management analysis was Morningstar's observation that the Structured Alpha team not only "performs a daily quantitative risk analysis, which includes a variety of stress tests", but also "benefits from Allianz Global Investors' independent risk oversight with real-time positioning monitoring."

### III.   AllianzGI Ignores Investment Mandate to Protect Pension Funds' Assets in Downturn in favor of Self-Interested Fee Structure.

70.     Had AllianzGI managed the Alpha Funds in accordance with the required risk management and investment strategy, the Pension Funds' tremendous losses would have been avoided. Not only did AllianzGI fail to properly hedge for an ongoing market downturn in late February 2020, but AllianzGI abandoned its investment mandate in 2020 and positioned the Alpha Funds' portfolios in a manner that exacerbated their losses.

71.     The coronavirus began to be widely covered by major U.S. news outlets as early as January 8, 2020.  On January 21, 2020, equity prices worldwide dropped due to fears that the coronavirus outbreak could slow global economic growth.  On February 3, 2020, Mohamed El-Erian, chief economist for AllianzSE, appeared on CNBC to comment on the impact of the spread of coronavirus. El-Erian said, "The coronavirus is different… it is big. It's going to paralyze China. It's going to cascade throughout the global economy. And, importantly, it cannot be countered…by central bank policies. So, I think we should pay more attention to this, and we should try and resist our inclination to buy the dip."

72.     Indeed, the VIX Index, which measures the market's expectations of volatility based on the S&P 500—and which increases in a market downturn—was at a historic high of 40 at the end of February 2020 and leading into March 2020.

73.     As volatility in the market increased, however, throughout February and March 2020, AllianzGI made a series of investments positioning the Funds' portfolio to generate returns **if volatility subsided**. Specifically, as the market began to slide in February 2020, and the Alpha Funds began incurring losses, AllianzGI structured the Alpha Funds' portfolios to recoup those losses, taking aggressive positions that deviated from the investment strategy and abandoning the risk controls Allianz was required to have in place.

74.     By the end of February 2020, AllianzGI positioned the portfolio to generate returns if the market stabilized and volatility levels declined, gambling that the Alpha Funds would reap substantial returns by selling an immense amount of high-premium

insurance that would never result in any claims from the investors who bought coverage. This positioning was totally contrary to the requirement that the Funds "Buy put options—in a greater quantity than sold—to protect in the event of a market crash/closure."

75.     Alpha 1000's holdings as of February 29, 2020, reveal that Alpha 1000 had an outsized net short put position, meaning the Alpha Funds would only produce returns if the markets became less volatile, leaving the Alpha 1000 severely exposed to the soaring volatility that accompanied the March 2020 market decline.  As of February 29, 2020, the Alpha 1000 Fund sold short equity put options worth $484 million, while purchasing (long) equity put options worth only $244 million. By being net short, the Fund would lose money on the put options if the market fell substantially, which it did. The Fund was net long on equity calls, which would increase in value if the market rose. The total effect of the Alpha 1000 Fund's net equity options position as of February 29, 2020 was that it was heavily weighted towards generating positive returns if the S&P 500 increased in value.  The net short put exposure was not only contrary to the investment mandate, but it also was substantially inconsistent with the historical range of put exposure maintained by the Alpha Funds over the previous ten years (albeit somewhat obscured by only month end (as opposed to daily) numbers Plaintiffs currently have).  The Alpha 1000 Fund targeted total put exposure at between 10-40% of assets under management; at the end of February, the total put exposure for the 1000 Fund **was in excess of 200% of the AUM**.

76.     Similarly, as of February 29, 2020, the Alpha 250 Fund had sold short equity put options worth more than the value of the long equity put options purchased ($117 million v. $67 million).  By being net short, the Alpha 250 would lose money on the put options if the market fell substantially in March, which it did.  As with the Alpha 1000 holdings in February, the Alpha 250 Fund was not "market-neutral" – it was only betting on an increase in equity prices and was left exposed to market decline.

77.     The Alpha Funds' positioning in volatility options was also anything but market neutral – it was positioned to decline in value if there was an increase in volatility. Rather than have positions that would protect the investors in the Alpha Funds in the event of further market downturn, the Alpha Funds were not hedged against a normal market decline, much less a more severe downturn.  The Alpha Funds did not have a diversified option strategy with proper risk modeling but instead AllianzGI took large, extremely risky positions that assumed equity prices would rise and volatility would fall.

78.     In breach of its duties of loyalty and care, AllianzGI took the massive risk of "doubling down" on its prior failed strategy in March 2020, without regard for the potential to increase the Pension Funds' losses, because AllianzGI needed to reverse the Alpha Funds' existing losses by March 31, 2020, or it would be unable to collect performance-based management fees from the Pension Funds and the other investors in the Structured Alpha Funds for the foreseeable future.

79.     Indeed, the market downturn in February and March 2020 was hardly unprecedented and resembled a pattern that has repeated numerous times in numerous

contexts.  For example, on October 19, 1987, commonly known as "Black Monday," the Dow declined over 22%, the largest single-day decline in history.

80.    In comparison, on March 16, 2020, the date of the biggest one-day drop of the coronavirus-related downturn, the Dow dropped just under 13%. Over the span of several weeks from mid-February through March 2020, the Dow lost about 35% of its value. Indeed, a March 31, 2020 research note by AllianzGI acknowledged, "Even though US equity markets have fallen around 25% this year, previous down-turns were worse: markets fell about 50% from peak to trough in 2001 and 2008[.]"

81.    Similarly, periods of sudden spikes in volatility are common and occur at least once a decade. VIX repeatedly peaked during the period of August 2011 to October 2018, including reaching a high of 50.3 in February 2018 compared to an average of 10.8 for the 30 prior trading days. On February 5, 2018, a day that would come to be known as "Volmageddon," VIX jumped by a record 20 points. AllianzGI specifically drew a comparison to that "volatility surge" in its fourth-quarter 2019 commentary for the Structured Alpha Funds, stating, "Structured Alpha's option portfolio is positioned for a strong improvement in the event of another February 2018-type move" as "refinements we have implemented since then as part of our ongoing R&D process have made the option portfolio more resilient."

82.    Despite the ample historical precedent for a market drawdown and volatility surge like what occurred in February and March 2020, and contrary to its purported "proprietary" risk management acumen, AllianzGI's management of the

Structured Alpha Funds' portfolios increased the likelihood of catastrophic losses. As an investment manager charged with being prepared for market downturns and to have "reinsurance" against catastrophic shocks, AllianzGI was required to have proper hedging positions in place to protect its clients' investments in the event of a sudden downturn. AllianzGI also should have maintained proper risk management protocol and stress testing to ensure that it remained disciplined with its downside protections.

83.     Against the backdrop of the broad market decline, the returns on AllianzGI's Alpha Funds for the first quarter of 2020 severely underperformed their benchmark indices. Specifically, March 2020 returns were - 41.59% for Alpha 250 compared to -12.35% for the S&P 500, - 45.13% for Alpha 500 compared to +0.29% for the 90 day Treasury Bill and – 96.5% for the Alpha 1000 Fund compared to +0.29% for the 90 day Treasury Bill.

84.     In breach of its duties of loyalty and care, AllianzGI took the massive risk of "doubling down" on its prior failed strategy in March 2020, without regard for the potential to increase the Pension Funds' losses, because AllianzGI needed to reverse the Alpha Funds' existing losses by March 31, 2020, or it would be unable to collect performance-based management fees from the Pension Funds and the other investors in the Structured Alpha Funds for the foreseeable future.

85.     AllianzGI has now admitted that in early March 2020, it embarked on this new approach, which it has referred to, ironically, as "de-risking." In this case, "de-risking" apparently meant (a) buying back short positions in a falling market (at

29

significant cost), (b) further shorting volatility, and (c) failing to hedge the Funds' portfolios to protect against further losses. This "de-risking" move was a total abandonment of the investment strategy, hedging and risk management practices that AllianzGI had promised the Pension Funds.

86. The dramatic losses that the Allianz Funds suffered throughout the market downturn were at odds with the structural risk protections that AllianzGI was required to have in place for them. Moreover, adequate stress testing for dramatic market movements-which the AllianzGI management team and Allianz Global Investors were required to perform for the Structured Alpha Funds regularly-should have highlighted the risks of a severe, multi-week decline and sudden uptick in volatility that occurred in February and March 2020.

### IV. The Pension Funds Suffer Substantial Losses as a Result of Allianz's Mismanagement and Breaches of Fiduciary Duties.

87. On January 31, 2020, the Teamsters Plan had $11,973,638 in assets in the Alpha 500 Fund and $13,057,743 in assets in the Alpha 1000 Fund. By the end of March, the Teamster Plan assets in the Alpha 500 Fund fell to $5,886,346 while the assets in the Alpha 1000 Fund fell to a mere $356,236.

88. On January 31, 2020, the 703 Plan had $18,716,450 in the Alpha 250 Fund, $2,311,979 in Alpha 500 Fund and $2,521,327 in the Alpha 1000 Fund.  By the end of March, the 703 Plan assets in the Alpha 250 Fund dropped to $9,498,361, Alpha 500 Fund dropped to $1,133,286, while the assets in the Alpha 1000 Fund fell to $68,786.

89.     Further, on a call with the Pension Funds, AllianzGI representative Jeff Sheran admitted that AllianzGI failed to "seal" its downside positions such that there was no floor with respect to how much the Alpha Funds could lose. Sheran further admitted that, "We should have been able to handle [this]."

90.     On March 25, 2020, AllianzGI hosted an investor webinar to announce it was liquidating the Alpha 1000 Fund. AllianzGI stated that liquidation was required because its investment strategy "was designed to address short-term volatility in the market and not the long-term uncertainty currently being faced." AllianzGI refused to respond to investor questions regarding (i) how this could have occurred if the Alpha Funds were positioned per strategy outlines; (ii) what AllianzGI would do for affected investors; or (iii) how they would support Alpha Fund investors through the liquidation process.

91.     On March 31, 2020, in a meeting of the Board, the Teamster Plan trustees agreed to submit redemption requests to AllianzGI for the total remainder of its investment in the Alpha 500 and Alpha 1000 Funds.

92.     On April 7, 2020, Morningstar Analysts highlighted AllianzGI's negligence in a report titled "A failure in risk management," downgraded the Alpha Funds to "Negative" across all share classes, and recommended that investors avoid the Alpha Funds. As Morningstar noted, AllianzGI's attempts to restructure the Structured Alpha Funds "exposed a serious weakness in the strategy" and risk management failures and imprudent restructuring efforts actually "locked in the strategy's . . . losses."

93.    As a result of Defendants' negligence, breaches of fiduciary duty and contract, and violations of ERISA, Defendants caused the Teamsters Plan to suffer losses reasonably believed to be in excess of $18.7 million and caused the 703 Plan to suffer losses reasonably believed to be in excess of $12.9 million.

## COUNT I: NEGLIGENCE

94.    The Pension Funds incorporate by reference the allegations contained in paragraphs 1-95, as though fully stated herein.

95.    As Managing Member of the Alpha Funds, AllianzGI owed a duty of care to the Pension Funds based on the special relationship, or "privity," arising out of the LLC Agreements, Subscription Agreements, and Side Letter Agreements between AllianzGI and the Pension Funds regarding each of the Alpha Funds.

96.    In addition, the PPM for the Alpha Funds provided that AllianzGI was "responsible for the general management of the investment portfolios of the Fund[s] under the Operating Agreement[s]." AllianzGI breached its duty to the Pension Funds by failing to exercise reasonable care in properly protecting the Alpha Funds against a severe market downturn.

97.    Specifically, AllianzGI failed to conduct adequate stress tests to assess the ability to trade the Alpha Funds' portfolios during times of low market liquidity or disregarded the results of the tests it conducted.

98.    In addition, AllianzGI abandoned the put spread strategy that it was supposed to have in place to provide structural risk protections to the Structured Alpha

Funds in any market environment.

99.     AllianzGI further was negligent by taking actions during the downturn—including restructuring the Structured Alpha Funds portfolio and strategies—that locked in and exacerbated their negative returns.

100.    AllianzGI's mismanagement of the Structured Alpha Funds runs contrary to AllianzGI's duty to build "structural risk protection" into its portfolios, as AllianzGI—as Managing Member of the Alpha Funds—was obligated to do on behalf of its investors.

101.    Defendants Allianz SE, AAM GmbH, Allianz of America, Inc., AAMA Holdings, AAMA LLC, AAMA LP, PFP, and AllianzGI Holdings are liable for the actions of AllianzGI under the doctrine of respondeat superior. AllianzGI's conduct was undertaken while carrying out its routine function as a portfolio manager, and engaging in such conduct as would have been reasonably expected.

102.    By virtue of the unified corporate structure of the Allianz Defendants and the relationships among the corporate parents of AllianzGI as alleged above, each of which had the power to influence and control and did influence and control, directly or indirectly, the acts of AllianzGI.

103.    Defendants also each acted in a joint enterprise by and among each other, including by holding out the management of the Alpha Funds through the operation of "Allianz Global Investors." In so doing, they acted as agents of one another, and acted under the ultimate authority and control, and for the benefit of Allianz SE.

104.     As a direct and proximate result of the actions and omissions by Defendants set forth above, the Pension Funds have sustained actual damages in an amount to be proven at trial.

## COUNT II: BREACH OF FIDUCIARY DUTY

105.     The Pension Funds incorporate by reference the allegations contained in paragraphs 1-106, as though fully stated herein.

106.     In its capacity as Managing Member of the Funds, AllianzGI owes all investor-members, including the Pension Funds, fiduciary duties, including the duty of care, and was required to act with the requisite level of care of a skilled investment manager to protect the Pension Funds' assets against a downside risk.

107.     AllianzGI breached its fiduciary duty of care by failing to protect the Pension Funds' assets against a downside risk of market collapse as it has previously represented.

108.      Indeed, for years, AllianzGI promised investors that a "cornerstone of the strategy's investment processes" included "multiple layers of risk control" and "structural risk protections" to "protect the portfolio in the event of a market crash."

109.     These risk protection measures would be "in place at all times, exclusively for risk management purposes." Yet, in mid-March 2020, AllianzGI failed to abide by the risk management strategies promised and which it previously adhered to during times of market unrest.

110.    Defendants Allianz SE, AAM GmbH, Allianz of America, Inc., AAMA Holdings, AAMA LLC, AAMA LP, PFP, and AllianzGI Holdings are liable for the actions of AllianzGI under the doctrine of respondeat superior. AllianzGI's conduct was undertaken while carrying out its routine function as a portfolio manager, and engaging in such conduct as would have been reasonably expected.

111.    By virtue of the unified corporate structure of the Allianz Defendants and the relationships among the corporate parents of AllianzGI as alleged above, each of which had the power to influence and control and did influence and control, directly or indirectly, the acts of AllianzGI.

112.    Defendants also each acted in a joint enterprise by and among each other, including by holding out the management of the Alpha Funds through the operation of "Allianz Global Investors." In so doing, they acted as agents of one another, and acted under the ultimate authority and control, and for the benefit of Allianz SE. As a direct and proximate result of the actions and omissions by Defendants set forth above, the Pension Funds have sustained actual damages in an amount reasonably believed to be in excess of $30 million.

## COUNT III: BREACH OF CONTRACT

113.    The Pension Funds incorporate by reference the allegations contained in paragraphs 1-114, as though fully stated herein.

114.    The LLC Agreement, PPM, and Subscription Agreement create a valid and enforceable contract.

115.    Pursuant to that contract, AllianzGI was expressly and impliedly required to manage the Funds in accordance with its stated risk management process. In the contract, AllianzGI represents that it will "do all acts for the preservation, protection, improvement, and enhancement in value of all assets." AllianzGI's policies required that it make certain that option positions were always in place to create a floor to protect LLC assets from significant market declines. Failing to implement risk management procedures to protect and preserve the Alpha Funds' assets would be a breach of that obligation.

116.    AllianzGI breached its contractual obligations by failing to abide by the risk management strategies promised – and previously adhered to in times of market unrest.

117.    However, AllianzGI itself admitted that it did not weather the market conditions in this situation appropriately, as AllianzGI failed to "seal" its downside position though "we should have been able to handle it."

118.    Defendants Allianz SE, AAM GmbH, Allianz of America, Inc., AAMA Holdings, AAMA LLC, AAMA LP, PFP, and AllianzGI Holdings are liable for the actions of AllianzGI under the doctrine of respondeat superior. AllianzGI's conduct was undertaken while carrying out its routine function as a portfolio manager, and engaging in such conduct as would have been reasonably expected.

119.    By virtue of the unified corporate structure of the Allianz Defendants and the relationships among the corporate parents of AllianzGI as alleged above, each of

which had the power to influence and control and did influence and control, directly or indirectly, the acts of AllianzGI.

120.    Defendants also each acted in a joint enterprise by and among each other, including by holding out the management of the Alpha Funds through the operation of "Allianz Global Investors." In so doing, they acted as agents of one another, and acted under the ultimate authority and control, and for the benefit of Allianz SE.

121.    As a direct and proximate result of the actions and omissions by Defendants set forth above, the Pension Funds have sustained actual damages in an amount reasonably believed to be in excess of $30 million as the Alpha Funds' assets were reduced by as much as 97 percent.

### COUNT IV: VIOLATION OF SECTION 404 & 406 OF THE EMPLOYEE RETIREMENT INCOME SECURITY ACT OF 1974

122.    The Pension Funds incorporate by reference the allegations contained in paragraphs 1-123, as though fully stated herein.

123.    In Section 2.10 of the LLC Agreement, AllianzGI acknowledges that it is a fiduciary with respect to the Pension Funds' Alpha investment and that it "shall at all times discharge its duties consistent with the standard of care imposed on fiduciaries under ERISA."

124.    ERISA imposes strict fiduciary duties upon plan fiduciaries. ERISA § 404(a)(1)(d), 29 U.S.C. § 1104(a)(1)(d), states, in relevant part that a "fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and . . . for the exclusive purpose of providing benefit to participants and

37

their beneficiaries . . . with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the contact of an enterprise of like character and with like aims . . . ."

125.    Greater than 25% of the Alpha Funds' assets are held by benefit plan investors and therefore the Alpha Funds' assets are plan assets subject to ERISA. Specifically, based on publicly available records, more than half of the $1.8 billion invested in the Alpha 1000 Fund were from retirement plans, including the Pension Funds

126.    As alleged above, the scope of the fiduciary duties and responsibilities of Defendants included managing the assets of the Alpha Funds for the Pension Funds' benefit, with the care, skill, diligence, and prudence required by ERISA. AllianzGI was directly responsible for, among other things, selecting prudent investment options and actively managing the Alpha Funds' risk on an ongoing basis.

127.    Yet, contrary to its duties and obligations under ERISA, AllianzGI did not manage the downside risk with the care, skill, diligence, and prudence its investment strategy and risk-management tactics required.

128.    As a result, AllianzGI breached its duties to prudently manage the Pension Funds' assets.

129.    An ERISA fiduciary also may not engage in certain prohibited transactions under ERISA § 406, including that a fiduciary "shall not deal with the assets of the plan

in his own interest or for his own account"  AllianzGI violated ERISA § 406 by, among other things, managing the Pension Funds' assets in its own self-interest and not for the exclusive purpose of providing benefits to the Pension Funds' participants and beneficiaries.  AllianzGI managed the Pension Funds' assets in the Structured Alpha Funds to maximize its own fees and thereby added undisclosed risks to the Alpha Funds in the process, rather than for the sole interest of safeguarding the Pension Funds' assets. AllianzGI did so by constructing the Alpha Funds as largely unprotected in the January and February 2020 timeframe and even further when the marked declined in February and March 2020, adding more risk to the Alpha Funds to chase returns and thus fees rather than protect the Pension Funds' assets.

130.    Defendants Allianz SE, AAM GmbH, Allianz of America, Inc., AAMA Holdings, AAMA LLC, AAMA LP, PFP, and AllianzGI Holdings are liable for the actions of AllianzGI under the doctrine of respondeat superior. AllianzGI's conduct was undertaken while carrying out its routine function as a portfolio manager, and engaging in such conduct as would have been reasonably expected.

131.    By virtue of the unified corporate structure of the Allianz Defendants and the relationships among the corporate parents of AllianzGI as alleged above, each of which had the power to influence and control and did influence and control, directly or indirectly, the acts of AllianzGI.

132.    Defendants also each acted in a joint enterprise by and among each other, including by holding out the management of the Alpha Funds through the operation of

"Allianz Global Investors." In so doing, they acted as agents of one another, and acted under the ultimate authority and control, and for the benefit of Allianz SE.

133.    As a direct and proximate result of the actions and omissions by Defendants set forth above, the Pension Funds have sustained actual damages in an amount reasonably believed to be in excess of $30 million

**WHEREFORE**, the Pension Funds respectfully request the Court to enter an order:

(a) awarding the Pension Funds compensatory damages in an amount to be proven at trial;

(b) awarding the Pension Funds disgorgement of fees that Defendants have collected;

(c) awarding costs pursuant to 29 U.S.C. § 1132(g);

(d) awarding attorney's fees pursuant to 29 U.SC. § 1132(g); and

(e) granting the Pension Funds any further and additional relief the Court deems just and proper.

Dated: September 25, 2020

/s/ Frederic S. Fox
KAPLAN FOX & KILSHEIMER LLP
Robert N. Kaplan, Esq.
Frederic S. Fox, Esq.
Donald R. Hall, Esq.
850 Third Ave., 14th Floor
New York, NY 10022
Telephone: (212) 687-1980
Email: rkaplan@kaplanfox.com
Email: ffox@kaplanfox.com
Email: dhall@kaplanfox.com

Scott F. Hessell
John Bjork
Ashima Talwar

SPERLING & SLATER, P.C.
55 West Monroe Street, Suite 3200
Chicago, Illinois 60603
(312) 641-3200

Co-Counsel for Plaintiffs